### THE BATTLER.

#### AMERICAN STEEL BARGE CO. v. THE BATTLER.

(District Court, S. D. New York. June 16, 1894.)

TUG AND TOW—WEATHER ON STARTING—FOG—STRANDING — USAGES OF TIME AND PLACE—NEGLIGENCE.

    A tug with a tow started to leave the mouth of the Kennebec river during a temporary lightening up of the prevailing fog. After her start the fog shut down again before the tow had reached the sea, and, the pilot of the tug having been deceived as to his position by misleading signals from an anchored vessel, and the current being changeable, and not to be counted upon, the tow was carried out of its course, and stranded, and this suit was brought to recover the damages. The evidence indicates that by the usages of the time and place the start of the tug was justifiable and reasonably prudent, and as, after starting, the immediate cause of the collision was the misleading signal of the anchored vessel, and the variable current, no fault could be found with her navigation after she had started; and hence, *held*, that the tug was not guilty of negligence.

Libel to recover damages for stranding of barge in tow of tug.

Barlow, Wetmore & Murray, for libelant.

Robinson, Biddle & Ward, for claimants.

BROWN, District Judge. In the afternoon of September 25, 1892, the libelant's barge No. 202, in coming out of the Kennebec river, bound for New York, in tow on a hawser from the steam tug

Battler, ran upon the rocks, during thick fog, at the upper end of Pond island, which lies directly at the mouth of the river. The above libel was filed to recover the damage, alleging that the tug was liable for making an improper start during foggy weather, and for not anchoring when shortly afterwards the fog shut down thick.

I think the weight of evidence is to the effect that at the time when Dix island was passed, Ft. Poppin below was sufficiently in view to warrant the tug in continuing on. Below Dix island, all the witnesses agree that there was no proper anchorage ground. The master of the tug was a competent pilot, and acquainted with the peculiarities of the river. The tug was taken in charge by the Battler at Parker's Flats, only about four miles distant from the open sea. Pond island, where the barge struck, as appears by the chart, is but about a quarter of a mile long, and was the last obstruction in the river, beyond which there was a free and open course seaward. Before reaching Pond island the fog had become so thick that no landmarks could be seen. Shortly before reaching it, the blasts of a fog horn were heard, which indicated a vessel under way. To avoid her, the captain of the tug ported his wheel. On passing her to the right, she was seen to be at anchor. The master immediately starboarded his wheel to reach his former course; but the current upon that day—which is changeable and cannot be counted upon—happened to set upon the head of Pond Island, which, as it turned out, was only about 600 feet from the schooner, so that the barge was unavoidably carried upon the rocks.

I think there is no doubt that the immediate cause of the loss, was the misleading signal from the schooner. Had her signal been that of ringing the bell, as required by law, the master of the tug would have understood that she was at anchor. Her fog horn indicated that she was under way; and she would naturally, therefore, be supposed to be more in mid-channel than if at anchor, and the master would also naturally aim to give her a wider berth, than if her signals had indicated that she was at anchor. No fault is shown in the master in these maneuvers; nor is it any fault that he did not know just how the current would set at that time.

It is urged, however, that knowing these uncertainties in the navigation of the Kennebec, and the liability to meet vessels either under way or at anchor, the tug is responsible for starting upon such a trip in unsafe weather, when these difficulties were known to be more or less likely to be met. This part of the case has been argued very elaborately for the libelant, on the general contention that the tug was not justified in taking any risks, but should have waited for clear weather before starting. It is somewhat against the force of this contention, that though navigators have been beset in innumerable instances with difficulties of the same general nature as arose here, no case is cited that seems parallel with the present, in which the vessel has been held liable. The weather had been foggy during the day, and continued so until about 4 o'clock, when it lightened up so that the sun was seen. Fogs are frequent upon the rivers of that region, and they skirt the coast, while a little out-

side the weather is clear. If the opportunities afforded by the temporary lifting of the fog are not availed of, long detentions and great interruptions of business follow. From these circumstances some modifications in the usages elsewhere followed in navigation naturally arise.

The testimony of the pilots and captains on the river is to the effect that frequently towards sundown there is a partial clearing up of the fog, continuing long enough to enable vessels to make safely the short trip of about four miles from Parker's Flats to the sea. Vessels come down to these flats and wait for the opportunity. This temporary clearing up is so common as to receive a special name, and is known as the "sundown glint." It was upon such a clearing up at about 4 o'clock that the tug started. The principal pilots examined, including some of the libelant's own witnesses, testified that they should have made the start under such circumstances, and would consider it reasonably safe and prudent to do so, though recognizing the possibility that the fog might shut down again before Pond island was passed.

The weight of evidence, on the whole, is clearly to the effect that by the usages of the time and place, and considering all the difficulties of navigation on the one hand, and the liabilities to long detention, if the apparent lightening of the fog for so short a trip was not made use of, on the other hand, the start was one that would be considered justifiable, and reasonably prudent by skillful and prudent pilots accustomed to navigate these waters; and that seems to me to absolve the tug from the charge of negligence.

In the case of The W. E. Gladwish, 17 Blatchf. 77–83, Fed. Cas. No. 17,355, Chief Justice Waite, in reference to the obligations of tugs, says:

"The tugs undertook to bring to this work such prudence and such nautical skill as was ordinarily required in such navigation; more was not contracted for, and more was not expected.".

In the case of The Allie, 24 Fed. 745, 749, the general subject of the obligation of a tug as affected by the usages of the time and place, was considered, and I cannot do better than repeat what was there said:

"The requirements of law are substantially the same, both as to the adequacy of the tug for the work assigned her, and as to proper weather for starting out; and it is the same that is applied to seaworthiness in general, viz. reasonable sufficiency for the particular trip or voyage, according to the judgment of persons versed in the business. The defense of unseaworthiness is not made out by showing that 'a stouter ship might have survived the peril.' Amies v. Stevens, 1 Strange, 128. The law does not require a vessel, to be seaworthy, to be capable of withstanding every peril; nor that a tug be capable of rescuing her tow in all weather; nor that she shall start only when there is no possibility of danger; nor that the master, in an emergency, shall infallibly do that which, after the event, others may think would have been best. The Hornet, 17 How. 100; The Star of Hope, 9 Wall. 230; The W. E. Gladwish, 17 Blatchf. '77, 83, Fed. Cas. No. 17,355; The Mohawk, 7 Ben. 139, Fed. Cas. No. 9,693. The tug must be reasonably adequate for the work undertaken, managed with reasonable judgment and nautical skill, and she must start only in weather that, in the judgment of nautical men, is reasonably safe for the trip. In whatever form the question comes up, wheth-

or as to seaworthiness, adequacy for the work, or the time of starting, it is a practical question of reasonable prudence and judgment. And as regards seaworthiness in general, or the adequacy of the tug for the work undertaken, there is no other final criterion than the judgment of practical men versed in the business and the customs and usages of the time and place, viewed as representing the judgment and knowledge of the time. To show this, the custom and practice of nautical men is admissible. See The Titania, 19 Fed. 101. 105-109, and cases there cited. The exercise of reasonable prudence and judgment, measured by this standard, does not exclude some remaining maritime risks. Against these risks it is the province of insurers to provide; otherwise the shipper is his own insurer."

The question of reasonable judgment and skill as affected by the general custom and practice of the time and place, is similar, whether it regards towage or unseaworthiness, or stowage, or navigation. See The Wilhelm, 47 Fed. 89; The Dan, 40 Fed. 691; The Titania, et supra; The Frederick E. Ives, 25 Fed. 447, affirmed on appeal.

Chief Justice Waite also in the case of The W. E. Gladwish, 17 Blatchf. 84, Fed. Cas. No. 17,355, in referring to the question whether the master should seek an opportunity to go on when overtaken by bad weather, says:

"This involved the exercise of judgment as to what ought to be done under the circumstances. A mere mistake is not enough to charge the tugs with any loss which followed. To make them liable, the error must be one which a careful and prudent navigator, surrounded by like circumstances, would not have made. * * * I cannot believe that ordinary prudence required an abandonment of the voyage, for the time being, by lying up or seeking a harbor. The tug was commanded by a competent master, and the captain of the barge was an experienced boatman. No objection was made by any one to going on, and it is evident that no person connected with the tow considered it necessary to stop." See. also, The Clematis, Brown, Adm. 499, 502, Fed. Cas. No. 2,876; The Allie, 24 Fed. 745, 749, and cases there cited.

The above rules seem to me so far applicable to this case as to absolve the tug from the charge of negligence, and the libel is, therefore, dismissed.